GA 2017.09.119 13:34:02 17-2041

In the United States District Court for the
Northern District of Illinois, Eastern Division

Ilya Shulman and Dmitry Godin,

                          Plaintiffs,

             vs.                    No.:

Zvi Feiner, Erez Baver and
FNR Healthcare, LLC, an Illinois corporation,

                        Defendants.

<u>Complaint</u>

The plaintiffs complain of the defendants, and each of them, as follows:

This complaint alleges, *inter alia*, violations under the Organized Crime Control Act of 1970, Pub. L. No. 91-42, Section 901(a), 84 Stat. 941, Racketeer Influenced and Corrupt Organizations (RICO) and is brought by Ilya Shulman and Dmitry Godin under that statute and state law claims in connection with schemes devised, conducted, participated and/or assisted in by defendants Zvi Feiner and Erez Baver, each of whom owned or was an officer of defendant FNR Healthcare, LLC to conduct or participate in, to various degrees, directly or indirectly, the conduct of the affairs of FNR Healthcare, LLC through a pattern of racketeering activity, or to conspire to do so, or to conspire to assist FNR Healthcare, LLC in conducting a pattern of racketeering activity and to wrongfully and unlawfully divert assets of Ilya Shulman and Dmitry Godin, and to conspire to assist to do so, all to the detriment of Ilya Shulman, Dmitry Godin, and others.

1

This complaint further alleges (i) violations of common law fiduciary duties by Zvi Feiner, (ii) claims of common law fraud against Zvi Feiner, Erez Baver and FNR Healthcare, LLC, (iii) civil conspiracy against Zvi Feiner and Erez Baver, (iv) equitable accounting against Zvi Feiner, Erez Baver and FNR Healthcare, LLC and (v) constructive trust against Zvi Feiner, Erez Baver and FNR Healthcare, LLC.

The relief sought includes actual damages, punitive damages and treble damages arising from the scheme to defraud set forth herein, an accounting, costs of investigation and suit, statutory interest and attorney's fees.

<u>Nature of the Case</u>

Defendants Feiner and Baver participated in and perpetrated frauds upon plaintiffs Godin and Shulman, as well as countless other victims ranging from a 90 year-old holocaust survivor, school teachers and sophisticated banking institutions. Defendants' schemes have had a profound destructive impact on every tier of the community. Their schemes revolved around the age-old promise of substantial profits in return for an initial investment to lure their victims. Feiner and Baver used their financial investment experience and expertise to create a system that shrouded their schemes from scrutiny and deceived plaintiffs and other investors for years. Feiner represented to investors that he would be able secure a return of at least 12% and as much as 18%. In the period of five years that Feiner and Baver perpetrated the schemes, Feiner and Baver stole and diverted over $20 million dollars from a wide range of investors.

In plaintiffs' case, Feiner used their investments and created limited liability companies to hold retirement home facilities (PROPCO) acquired in the schemes. The daily operations of the facilities would be handled by a different entity (OPCO) which would pay rent to the PROPCO. Feiner would install himself as the sole-manager of the PROPCO with extensive powers to carry out his plans. As a further part of the scheme to defraud, Feiner deceived plaintiffs by misrepresenting the price of the facilities. The deception resulted in a much higher membership interest for Feiner than the plaintiffs would otherwise have agreed to if they had known that they financed 100% of the acquisition of a facility rather than a portion. Feiner's intention after acquiring the retirement facilities was never to manage them as he represented to plaintiffs, rather, Feiner intended to dispose of the facilities and secrete the profits from the sales. Some of the facilities sold by Feiner were done so through the execution of an option held by the OPCO. The scheme went deeper in that Feiner misrepresented the price of the purchase option held by the OPCOs and concealed that he held an interest in the OPCOs. Feiner, as president, and Baver, as vice president, controlled and used FNR Healthcare, LLC, (FNR Healthcare) an Illinois limited liability company, to solicit, induce, aggregate, disburse and manage investors' capital, to acquire and dispose of retirement healthcare facilities, and convert proceeds from the sale of the retirement healthcare facilities to themselves.

In further schemes to defraud, Feiner induced Israel Starck, a 90-year old holocaust survivor, to invest $2.5 million to purchase Feiner's membership shares in

LLC's by representing to Mr. Starck that he would receive a substantial fixed return. Feiner never intended to meet that obligation. Feiner did not own the membership interests that he purportedly sold to other investors.

Another victim, Henry Lieberman, was defrauded out of $1.5 million by promises of distributions in return for Feiner's membership shares. Feiner and Baver went as far as to abuse their standing in the Jewish community by inducing a group of school teachers to combine their savings in order to invest with them by promising returns they could not get elsewhere. In an attempt to secure their family's future, the teachers were defrauded out of their life savings instead. Defendants' schemes were successful even against a sophisticated banking institution upon whom Feiner committed bank fraud upon by pledging collateral he didn't own but that instead belonged to plaintiffs thus rendering the bank unable to recover on the $3 million loan. The schemes were of a nature and caliber that even a sophisticated investor was unable to detect them at the time they were perpetrated.

The defendants' schemes relied on further investments from plaintiffs and in order to secure those future investments defendants had to make it seem as if the investments were truly generating the returns as promised. Feiner induced additional investments from plaintiffs and others by initially making it appear he was meeting his representations and obligations. In fact, Feiner induced plaintiffs' investments to acquire seven different facilities in a short span of two years (2012 – 2013) and the promised distributions started to be delayed the very next year (2014). The defendants were able to prolong their schemes by making distributions

4

from time to time, enough to assuage any suspicions from plaintiffs and other investors. Defendants also delayed discovery of their scheme by deceiving the plaintiffs that defendants were negotiating with potential buyers even though they had already sold the properties and pocketed the proceeds.

Defendants executed their schemes with the intent to defraud individuals and diverted their investments to enrich themselves, their families and various family trusts. In February 2017 the plaintiffs first discovered that the properties they had invested in had been sold by about September 2015. Defendants admitted the schemes when confronted by plaintiffs in February 2017. Even so, the defendants committed bank fraud as late as March 31, 2017 and in all likelihood continue operating their schemes to cover up their misconduct in other deals.

Plaintiffs were directly victimized by this conduct. As a direct and proximate cause the schemes described in this Complaint, the plaintiffs have suffered losses of $541,333.00 plus interest in the form of unpaid quarterly distributions and $21,000,000.00 in the form of fraudulent inducement of investments and unpaid proceeds from the disposition of the property in five separate deals.

<u>Jurisdiction and Venue</u>

1.      This Court has jurisdiction over the claims for relief under 18 U.S.C. § 1964(c) (Right to Sue and Treble Damages), 28 U.S.C. § 1331(a) (Federal Question) and 28 U.S.C. § 1367 (Supplemental Jurisdiction State Claims).

Personal Jurisdiction and Venue

2. This Court has jurisdiction over the claims for relief under 18 U.S.C. § 1964(c) (Right to Sue and Treble Damages), 28 U.S.C. § 1331(a) (Federal Question) and 28 U.S.C. § 1367 (Supplemental Jurisdiction State Claims) since the defendants are all residents of this district and most of the misconduct alleged occurred in this district.

Relevant Times

3. The relevant times to this Complaint are from January 13, 2012 through the present time.

Parties

4. Ilya Shulman [Shulman] is an individual and a resident of Lake County, Illinois.

5. Dmitry Godin [Godin] is an individual and a resident of Cook County, Illinois.

6. Zvi Feiner [Feiner] is an individual and a resident of Chicago, Cook County, Illinois.

7. Erez Baver [Baver] is an individual and a resident of Cook County, Illinois.

8. FNR Healthcare, LLC [FNR Healthcare] is an Illinois limited liability company with its principal place of business in Skokie, Cook County, Illinois.

9. Feiner is the owner of FNR Healthcare and Baver is the operating officer of FNR Healthcare.

6

<u>The Pattern of Unlawful Racketeering Activity</u>

10.     In or about 2012, Feiner and Baver developed schemes to defraud investors.  Their schemes used the FNR Healthcare, LLC entity to aggregate and facilitate the wire transactions which defrauded plaintiffs and numerous other investors out of quarterly distributions and proceeds from the sale of healthcare facilities. At all relevant times herein, Feiner and Baver operated and managed the affairs of FNR Healthcare, LLC as president and executive vice president respectively.

<u>FNR Lakeview, LLC Scheme</u>

11.     On January 13, 2012 Feiner, using FNR Healthcare, LLC, convinced Shulman and Godin to engage his services as an experienced investment manager in healthcare assets.

12.     Feiner solicited Shulman's and Godin's investments by emailing to them the opportunity to acquire a retirement facility located in Wayne, New Jersey.

13.     The solicitation took the form of numerous e-mails between Feiner and plaintiffs. Feiner explained that there was an opportunity to invest by acquiring a retirement facility located in Wayne, New Jersey.

14.     On February 10, 2012, Ilya Shulman received via e-mail a memo prepared on behalf of Feiner setting out the financial structure of purchasing the retirement facility.  Godin/Shulman would own seventy percent (70%) of the real estate assets and Feiner would own the other thirty percent (30%). Godin/Shulman group was to invest three million dollars ($3,000,000.00) with $400,000.00 due as

earnest money before February 15, 2012 and the rest of the $2,600,000.00 paid by April 25, 2012.

15.     Feiner represented to plaintiffs that he would personally guaranty the $400,000.00 initial capital contribution if the deal did not close by June 30, 2012.

16.     On February 14, 2012 Feiner caused the plaintiffs to wire transfer $400,000.00 to FNR Healthcare's bank account located at Brickyard Bank in Lincolnwood, Illinois in order to satisfy the earnest money requirement for the acquisition of the retirement facility. Feiner confirmed receipt of the wire transfer that same day via email.

17.     On or about May 18, 2012, Feiner caused plaintiffs to wire transfer $2,600,000.00 to FNR Healthcare's bank account located at Brickyard Bank in Lincolnwood, Illinois in order to satisfy the closing money requirement for the acquisition of the retirement facility.

18.     On June 6, 2012, plaintiffs and Feiner entered into an operating agreement for FNR Lakeview, LLC (Lakeview) a Delaware Limited Liability Company. The plaintiffs held a 70% interest while Feiner held a 30% interest in the newly created LLC. Further, Feiner was designated as the sole manager of Lakeview with the powers and duties granted to him under Delaware law. The operating agreement between Godin, Shulman and Feiner provides that the manager was in a fiduciary relationship with Godin and Shulman. The operating agreement is attached hereto as exhibit A.

19.     Pursuant to the Lakeview operating agreement, plaintiffs were to receive quarterly distributions based on a formula which took into account their individual capital contributions and a preferred return of fifteen percent (15%).

20.     On June 20, 2012, Feiner communicated to plaintiffs via e-mail that the closing on the Lakeview facility had been successfully completed.

21.     On June 28, 2012, Feiner caused the wire transfer of plaintiffs' aggregated funds of $2,265,000.00 from FNR Healthcare's bank account located at Brickyard Bank to the seller of the New Jersey facility. Lakeview then became the owner of the New Jersey facility.

22.     On information and belief, Feiner and Baver used some of plaintiff's investments to pay off their respective home mortgages and otherwise diverted the sale proceeds instead of paying the plaintiffs.

23.     On information and belief, Feiner started to seek buyers for the New Jersey facility soon after it had been acquired by Lakeview.

24.     On information and belief, Feiner entered into negotiations with a potential purchaser, Lakeview Properties, LLC, in 2013 that had an interest in acquiring the New Jersey facility held by Lakeview.

25.     Baver, as executive vice president of FNR Healthcare, played a key role throughout the negotiations.  He discussed terms, gave input and signed the letter of intent related to the acquisition of the New Jersey facility.

26.     Baver's actions were motivated by the commission he would receive upon the disposition of Lakeview's assets and property by Feiner.

9

27.     At no time during 2013 did Feiner take any steps to notify plaintiffs that he had engaged in negotiations intending to dispose of the New Jersey facility held by Lakeview.

28.     The scheme to sell the New Jersey facility in 2013 ultimately fell through after a letter of intent, the asset purchase agreement, and various other instruments were signed by Feiner.

29.     In 2015 plaintiffs stopped receiving their quarterly distributions due under the Lakeview operating agreement.

30.     Plaintiffs immediately inquired why they had not received their distributions.  Feiner explained that it was due to troubles with the operator of the New Jersey facility but represented that he would cover the mortgage payments due and would get things back on track.

31.     Early in 2015, Feiner notified plaintiffs that he had found a buyer for the New Jersey facility and that the deal would close on September 2015.

32.     Plaintiffs relied on Feiner's promises that there was a deal in place to sell the New Jersey facility and that they would be at least be able to recoup their initial investment of $3,000,000.00.

33.     On April 3, 2015, unbeknownst to plaintiffs, Feiner executed a binding term sheet between Lakeview and Wayne Group Lakeview, LLC and Tri-State Healthcare Management, LLC.  The purchase price for the New Jersey facility was to be $11,125,000.00:

        a.      $650,000.00 due by April 3, 2015;

10

b.     $1,000,00.00 due before April 13, 2015;

c.     Payments of $250,000.00 each month until closing up to a total of $1,000,000.00; and

d.     Balance of the purchase price on the closing date.

Feiner concealed the binding term sheet and its terms from plaintiffs.

34.     On June 12, 2015, Feiner executed the real estate and asset purchase agreements on behalf of Lakeview. Feiner did not notify plaintiffs that he had executed the above agreements.

35.     On September 4, 2015, unbeknownst to plaintiffs, Feiner completed the sale of the New Jersey facility to purchasers, Wayne Group Lakeview, LLC and Tri-State Healthcare Management, LLC.   Feiner concealed the closing from plaintiffs and actively mislead them whenever they inquired about the transaction.

36.     Neither Feiner nor Baver ever distributed plaintiffs' share of the purchase price as it became due. However, Feiner caused the wire transfer of payments due under the term sheet from the buyers' bank accounts to FNR Healthcare's bank accounts.

37.     At the end of 2015 the plaintiffs inquired about the status of the closing since the September 2015 date Feiner had promised had arrived and passed and there was still no closing.   In an attempt to string-along and intentionally deceive the plaintiffs, Feiner explained to them that there were some setbacks but the purchaser was serious and had allocated $2,000,000.00 in escrow that the

plaintiffs would receive even if the deal did not go through. These were lies since the New Jersey facility had now been sold and Feiner had converted the proceeds.

38.     Feiner actively deceived the plaintiffs throughout 2016 that the deal to sell the New Jersey facility was suffering small setbacks. When questioned about the $2,000,000.00 in escrow, Feiner represented to plaintiffs that the bank had taken it to pay off the mortgage. This representation was false.

39.     Further, Feiner caused the transmission by wire of letters intended to deceive the plaintiffs by sending them false confirmatory documents for the sale of the New Jersey facility.

40.     The documents gave the buyers a lot of leeway in terms of closing date in another attempt to deceive and delay the discovery of the sale of the New Jersey facility on September 4, 2015.

41.     Plaintiffs relied on the fake confirmatory documents that Feiner provided and were unaware of the fraud that was perpetrated upon them.

42.     In yet another attempt to deceive plaintiffs and delay discovery of the scheme, Feiner represented to plaintiffs that the buyer of the New Jersey facility had put up another $400,000.00 in escrow and that they would receive it when it cleared the wire. This representation was false since the sale of the New Jersey facility had already concluded.

43.     On October 31, 2016, Feiner caused the transfer of representations via cellphone text messages to Godin telling him to expect the wire for the $400,000.00 within the week and the closing to take place by December 31, 2016.

44. Feiner also represented to Godin that the potential buyers had invested $4,000,000.00 into the deal and that was enough for them to follow through with the closing.

45. On November 3, 2016, Feiner caused the transfer of representations via cellphone text messages to Godin explaining that he was still waiting on the wire transfer of the $400,000.00 and represented to Godin that he had been calling the potential buyer three times a day inquiring about the wire and had been given different excuses each time.

46. On November 6, 2016, Feiner caused the transfer of representations via cellphone text messages to Godin assuring him that they could expect the wire by November 7, 2016. In order to deceive Godin and maintain the appearance of ongoing negotiations, Feiner represented to Godin that he would issue the checks from FNR Healthcare's accounts for the amount supposedly held in escrow but asked Godin not to deposit the checks until Feiner had received confirmation that the wire had cleared.

47. Feiner then proceeded to deliver to Shulman two checks dated November 7, 2016 from FNR Healthcare's account for the amounts of $50,000.00 and $350,000.00 purportedly for the amount that was being held in escrow.

48. On November 7, 2016, Feiner caused the transfer of false representations via cellphone text messages to Godin that he was told the amount in escrow had been wired but he had not seen the funds and had asked for written confirmation. Godin attempted to contact Feiner via cellphone for the next eight

days to figure out a solution to the escrow fund problem, however, Feiner did not reply.

49.     On November 9, 2016, Godin contacted Baver via cellphone text messages stating that he intended on depositing the checks Feiner had delivered to Shulman.  Baver lied to Godin that the purported buyer was still waiting on the wire to clear on their end and once that occurred they would send the wire to FNR Healthcare as soon as that occurred.

50.     Feiner's and Baver's telephonic representations were false since the Lakeview facility had been sold more than a year prior to the November 2016 telephonic communications.

51.     Feiner and Baver made the above misrepresentations, among others, knowing they were false and/or with reckless disregard for their falsity.

52.     Feiner and Baver made the above misrepresentations among others, with the intent to deceive plaintiffs.

53.     Feiner's and Baver's representations were made willfully and wantonly.

54.     Plaintiffs reasonably relied upon the misrepresentations of Feiner and Baver.

55.     On November 30, 2016, after weeks of delay plaintiffs were able to finally deposit their purported escrow payment checks.

56.     As vice president of FNR Healthcare, Baver had intimate personal knowledge of FNR Lakeview, LLC's accounts and financial status. Baver withheld

14

and misrepresented information sought by plaintiffs at every step until plaintiffs discovered the scheme and confronted him.

57.     Throughout the entire acquisition and disposition process of Lakeview, Baver acted in concert with Feiner to further advance the scheme by managing the finances, wire transfers, records, negotiations, and distributions in connection with Lakeview and further received commission from the disposal of Lakeview.

58.     In connection with the FNR Lakeview scheme, Feiner and Baver engaged in numerous acts of wire fraud.  Feiner solicited and accepted Shulman's wire for $3 million dollars to obtain the financing for the purchase of the retirement facility located in Wayne, New Jersey.  Further, Feiner used wire transfers to complete the sale of the same retirement facility to a 3rd party buyer on September 4, 2015.  Feiner also made use of wire transmissions to actively deceive and delay discovery of his scheme by transmitting false representations via email and cellphone text messages, and by transmitting false documents purporting to illustrate a deal in place to dispose of the New Jersey facility when in reality it had already been disposed of one year earlier.  Further, Feiner made use of wire transmissions to actively deceive plaintiffs and delay discovery of his scheme by transferring $400,000.00 from FNR Healthcare's bank account to plaintiffs in order to effectuate his scheme that the buyers had put up said money in escrow in preparation of executing the sale of the New Jersey facility. Feiner and Baver successfully converted the net proceeds from the sale of Lakeview for their own use instead of distributing it to the plaintiffs in accordance with the operating

agreement. Feiner and Baver used FNR Healthcare to aggregate investments, pay distributions, and convert sale proceeds by transfers by wire.

59.     As a direct result of their fraud and their failure to pay Godin and Shulman a proportionate share of the proceeds of the sale, they sustained injuries of a pecuniary nature in an amount not less than $2,550,000.00.

## FNR South Holland Scheme

60.     In another scheme to steal in connection with transactions related to the acquisition and disposal of retirement healthcare facilities, Feiner and Baver diverted the proceeds from the disposal of a retirement healthcare facility located in South Holland, Illinois for their own use.

61.     In late 2012, Feiner, using FNR Healthcare, LLC, solicited Shulman and Godin to engage his services as an experienced investment manager in healthcare assets.

62.     The solicitation took the form of numerous e-mails between Feiner and plaintiffs. Feiner explained that there was an opportunity to invest by acquiring a retirement healthcare facility located in South Holland, Illinois.

63.     The South Holland facility specialized in providing assisted living arrangements (AL) and skilled nurse (SN) services for the elderly.

64.     On or before November 30, 2012, Feiner caused the plaintiffs to make use of the wire to transfer $700,000.00 to FNR Healthcare's bank account located at Brickyard Bank in Lincolnwood, Illinois as earnest money for the acquisition of the

South Holland retirement facility. Feiner explained that the closing would take place sometime in February 2013.

65. Further, according to a November 30, 2012 email, Feiner came up with the idea to separate the South Holland facility into two entities, one encompassing the assisted living services and the other encompassing the skilled nursing services.

66. On January 9, 2013, Feiner requested from plaintiffs an additional $1,000,000.00 in earnest money to be transferred by wire ahead of the anticipated closing date of February 28, 2013.

67. On March 12, 2013, Feiner explained that he would be providing different operating agreements for the skilled nurse facility and assisted living facility with the capital allocation being $4,000,000.00 for SN and $3,600,000.00 for AL. Feiner represented to plaintiffs that the two facilities would be cross-collateralized/cross-defaulted.

68. This representation was false as the two facilities were only cross-collateralized/cross-defaulted as to the bank issuing the loan and not as to the plaintiffs.

69. Feiner's representation was also false because the purchase price for the facilities was inflated in order for Feiner to receive a larger percentage of the membership interest in the company. Feiner represented that he would be contributing equity into the deal when in reality the plaintiffs contributed 100% of the equity.

17

70.     Feiner made the above misrepresentations, among others, knowing they were false and/or with reckless disregard for their falsity.

71.     Feiner made the above misrepresentations among others, with the intent to deceive plaintiffs.

72.     Plaintiffs reasonably relied upon the misrepresentations of Feiner.

73.     On or about April 19, 2013, Feiner caused the plaintiffs to wire transfer money to FNR Healthcare's bank account located at Brickyard Bank in Lincolnwood, Illinois to effectuate closing of the acquisition of the South Holland healthcare retirement facilities.  Feiner confirmed receipt of the wire transfer later that same day via email.

74.     On April 25, 2013, the operating agreement for FNR South Holland, LLC (South Holland) a Delaware Limited Liability Company was filed with the Illinois Secretary of State.  This operating agreement encompassed the parties' understandings and terms for the management of the skilled nursing facility. According to the agreement, the plaintiffs held a 64.2% interest for investing $3,691,960 while Feiner held the rest of the interest in the newly formed LLC. Further, Feiner was designated as the sole manager of South Holland with the powers and duties granted to him under Delaware law. The operating agreement between Godin, Shulman and Feiner provides that the manager was in a fiduciary relationship with Godin and Shulman. The operating agreement is attached hereto as exhibit B. Feiner was already in a fiduciary capacity by virtue of the earlier Lakeview operating agreement.

75.    The parties also filed with the Illinois Secretary of State the operating agreement for FNR SH Healthcare (SH Health) a Delaware Limited Liability Company.  This operating agreement encompassed the parties' understandings and terms for the management of the assisted living facility.

76.    On April 30, 2013, Feiner alerted the plaintiffs that the South Holland deal had successfully closed and promised plaintiffs that they could expect their first distributions after the coming July and every quarter thereafter for the foreseeable future.

77.    In 2016, the plaintiffs learned that SH Health (assisted living facility) was performing very poorly.

78.    The plaintiffs further discovered that Feiner had misled them because the two facilities were only cross-collateralized as to the bank that issued the loans meaning that the bank would take profits from South Holland to cover any losses by SH Health.  This effectively meant that the plaintiffs would not receive any distributions.

79.    Feiner misled plaintiffs to pay $268,000.00 to the bank so it would break the cross-collateralization.  Feiner applied plaintiffs' distributions to break the cross-collateralization. Feiner further represented to plaintiffs that he would personally guaranty this amount.

80.    Unbeknownst to the plaintiffs, this was a ploy by Feiner to make South Holland as attractive to buyers as possible so that he could dispose of it and convert the proceeds of the sale.

19

81.     On September 30, 2016, Feiner accomplished his goal and sold South Holland to a third party buyer and operator, The Villa at South Holland, LLC. Upon information and belief, Feiner used wire transfers to effectuate the disposition of South Holland and received through wire transfer net proceeds of $3,617,163.15.

82.     As vice president of FNR Healthcare, Baver had intimate personal knowledge of FNR South Holland, LLC's accounts and financial status. Baver withheld and misrepresented information sought by plaintiffs at every step until plaintiffs discovered the scheme and confronted him.

83.     Throughout the entire acquisition and disposition of South Holland, Baver acted in concert with Feiner to further advance the scheme by managing the finances, wire transfers, records, negotiations, and distributions in connection with South Holland and further received commission from the disposal of South Holland.

84.     In connection with the FNR South Holland scheme, Feiner and Baver engaged in numerous acts of wire fraud.  Feiner solicited and accepted plaintiffs' wire of $3,600,000.00 to obtain the financing for the purchase of the retirement facility located in South Holland, Illinois.  Further, Feiner used wire transfers to complete the sale of the same retirement facility to a third party buyer, and operator, on September 30, 2016.  Feiner actively deceived plaintiffs in order to advance his scheme by misusing plaintiffs' distributions of $268,000.00 to break the cross-collateralization of South Holland and SH Health facilities and make South Holland more attractive to potential buyers. Feiner and Baver successfully converted the net proceeds from the sale of South Holland for their own use instead

of distributing it to the plaintiffs in accordance with the operating agreement. Feiner and Baver used FNR Healthcare to aggregate investments, pay distributions, and convert sale proceeds by transfers by wire.

85.     As a direct result of their fraud and their failure to pay Godin and Shulman a proportionate share of the proceeds of the South Holland sale, they sustained injuries of a pecuniary nature in an amount not less than $3,700,000.00.

### FNR Vermillion Scheme

86.     In yet another scheme to steal in connection with transactions related to retirement healthcare facilities, Feiner and Baver converted the proceeds from the sale of a retirement healthcare facility located in Danville, Vermillion County, Illinois.

87.     Feiner used his newly acquired fiduciary position as manager of FNR Lakeview, LLC to induce further investments from Shulman and Godin through the use of the wire, mainly emails and telephonic communications.

88.     On July 7, 2013, Feiner contacted plaintiffs via the use of wire communications, emails, that there was an opportunity to invest by acquiring a retirement healthcare facility located in Danville, Vermillion County, Illinois.

89.     On July 17, 2013, Feiner caused the transmission by wire of the FNR Vermillion, LLC (Vermillion) operating agreement setting forth the capital contributions and ownership percentages in the Vermillion facility. The plaintiffs would invest $1,000,000.00 in return for 35.89% ownership in Vermillion. The operating agreement between Godin, Shulman and Feiner expressly set out that the

manager held a fiduciary relationship to Godin and Shulman. The operating agreement is attached hereto as exhibit C.

90.     On July 24, 2013, Feiner solicited $1,000,000.00 via wire from plaintiffs, with half the amount due before August 1, 2013 and the rest due by August 20, 2013.

91.     On or about July 30, 2013, Feiner caused the plaintiffs to make use of the wire to transfer $500,000.00 to FNR Healthcare's bank account located at Brickyard Bank in Lincolnwood, Illinois.

92.     On or about August 22, 2013, Feiner caused the plaintiffs to make use of the wire to transfer $500,000.00 to FNR Healthcare's bank account located at Brickyard Bank in Lincolnwood, Illinois to effectuate closing of the acquisition of the Vermillion healthcare retirement facility.

93.     Upon information and belief, Feiner used FNR Healthcare to aggregate the plaintiffs' investments and transfer by wire the $1,000,000.00 to the seller in order to acquire the Vermillion facility.

94.     Feiner's intention was never to keep and manage Vermillion pursuant to the operating agreement but – once he had the plaintiffs' money in the property - to sell it and convert the proceeds from the sale. The disposition was initiated when the operator for Vermillion, Gardenview Manor Realty, LLC, triggered the option to purchase the facility. Unbeknownst to the plaintiffs, the option to purchase was substantially lower than the $7,000,000.00 represented by Feiner at the time of acquisition.

95.     On or about April 30, 2015, Feiner accomplished his scheme and sold Vermillion to a third party buyer and operator, Gardenview Manor Realty, LLC, an entity managed by Barak Baver, Erez Baver's brother.

96.     Upon information and belief, Feiner used FNR Healthcare's bank account for the wire transfer of the net proceeds from the disposition of Vermillion.

97.     At no time did Feiner or Baver notify plaintiffs that the sale had taken place as required by the operating agreement nor did Feiner or Baver distribute any proceeds from the disposition of Vermillion pursuant to the operating agreement.

98.     Instead, Feiner actively misled plaintiffs for over eighteen (18) months with false promises and false reasons whenever plaintiffs inquired about the state of Vermillion.   However, in order to keep up the ruse, Feiner kept making distributions to plaintiffs.

99.     As vice president of FNR Healthcare, Baver had intimate personal knowledge of FNR Vermillion, LLC's accounts and financial status. Baver withheld and misrepresented information sought by plaintiffs at every step until plaintiffs discovered the scheme and confronted him.

100.    Throughout the entire acquisition and disposition of Vermillion, Baver acted in concert with Feiner to further advance the scheme by managing the finances, wire transfers, records, negotiations, and distributions in connection with Vermillion and further received commission from the disposal of Vermillion.

101.    In connection with the FNR Vermillion scheme, Feiner and Baver engaged in numerous acts of wire fraud.  Feiner caused the plaintiffs to transfer by

wire $1,000,000.00 to obtain the financing for the purchase of the retirement facility located in Danville, Illinois. Further, Feiner employed wire transfers to complete the sale of the same retirement facility to a third party buyer, and operator, on or about April 30, 2015. Feiner and Baver successfully converted the net proceeds from the sale of Vermillion for their own use instead of distributing it to the plaintiffs in accordance with the operating agreement. Feiner and Baver used FNR Healthcare to aggregate investments, pay distributions, and convert sale proceeds by transfers by wire.

102. As a direct result of their fraud and their failure to pay Godin and Shulman a proportionate share of the proceeds of the Vermillion sale, they sustained injuries of a pecuniary nature in an amount not less than $1,000,000.00.

<u>FNR Woodview Scheme</u>

103. On October 16, 2013, Feiner solicited via wire, email, monetary investment from plaintiffs. The email contained a brief description of the retirement healthcare facility located in Ft. Wayne, Indiana. Feiner touted the facility as "highly attractive" and the "premier facility in Ft. Wayne, IN."

104. To further entice the plaintiffs, Feiner represented that he had entered into an agreement with a large Indiana operator who would personally guarantee the lease and escrow $500,000.00 as a security deposit.

105. Feiner caused the transmission by wire of the FNR Woodview, LLC (Woodview) operating agreement setting forth the capital contributions and ownership percentages in the Ft. Wayne facility. The operating agreement between

Godin, Shulman and Feiner expressly set out that Feiner, as the manager, was in a fiduciary relationship with Godin and Shulman. The operating agreement is attached hereto as exhibit D.

106.    On October 22, 2013, plaintiffs and Feiner entered into the operating agreement for the Ft. Wayne facility. The facility would be held by Woodview and Feiner would serve as the manager. The plaintiffs invested $2,900,000.00 in return for a seventy (70) percent interest in Woodview.

107.    Plaintiffs only received a combined seventy percent membership interest in Woodview despite providing one hundred (100) percent of the equity while Feiner received a thirty percent membership interest in return for the sweat equity he was expected to contribute. Feiner's thirty percent represented sweat equity that would be paid out in the event the facility was sold and even then Feiner's interest was to be re-paid only after the plaintiffs' initial $2,900,000.00 contribution was recovered.

108.    In December 2013, Feiner caused the plaintiffs to make use of the wire to transfer $600,000.00 to FNR Healthcare's bank account located at Brickyard Bank in Lincolnwood, Illinois to effectuate closing of the acquisition of the Woodview healthcare retirement facility.

109.    On December 30, 2013, Erez Baver communicated with plaintiffs via wire, email, and confirmed receipt of the $600,000.00 wire transfer from plaintiffs to FNR Healthcare's bank account. In further emails, plaintiffs requested the amount still due for Woodview and the wire instructions for transferring the required

amount. Baver replied via email that the total amount still due was $2,300,000.00 and sent the instructions for wiring that amount to FNR Healthcare's bank account.

110.   On December, 2013, Feiner caused the plaintiffs to use of the wire to transfer $2,300,000.00 to FNR Healthcare's bank account located at Brickyard Bank in Lincolnwood, Illinois to aggregate the funds necessary to acquire of the Woodview healthcare retirement facility.

111.   Feiner then caused the transfer by wire of the aggregated funds in FNR Healthcare's bank account to the seller to acquire the Woodview healthcare retirement facility.

112.   Sometime midway 2015, Feiner engaged in a cash-out refinance of the Woodview facility and obtained approximately $1,023,529.00 in cash.

113.   Feiner did not notify plaintiffs of the refinance nor the $1,023,529.00 he had obtained.  In fact, Feiner continued paying out the quarterly distributions to plaintiffs in order to deceive plaintiffs and cover up his scheme for over eighteen (18) months.

114.    Throughout the entire acquisition and cash-out refinance process of Woodview, Baver acted in concert with Feiner to further advance the scheme by managing the finances, wire transfers, records, negotiations, and distributions in connection with Woodview.

115.   In connection with the FNR Woodview scheme, Feiner and Baver engaged in numerous acts of wire fraud.  Feiner solicited and accepted plaintiffs' transfer by wire of $2,900,000.00 to obtain the financing for the purchase of the

26

retirement facility located in Ft. Wayne, Indiana. Further, Feiner employed wire transfers to complete the acquisition of the same retirement facility from 3rd party seller. Feiner and Baver successfully converted the funds obtained from the cash-out refinance of the Woodview healthcare retirement facility for their own use instead of distributing it to the plaintiffs in accordance with the operating agreement. Feiner and Baver used FNR Healthcare to aggregate investments, pay distributions, and convert cash-out refinance funds by transfers by wire.

116. As a direct result of their diversion of money from the cash-out refinance and the failure to pay plaintiffs a proportionate share of the funds acquired through the Woodview refinance, plaintiffs suffered injuries of pecuniary nature in an amount not less than $1,023,529.00.

<u>FNR Morris, LLC Scheme</u>

117. On April 23, 2013, Feiner, sent an email to plaintiffs soliciting their investment in another retirement healthcare facility. Feiner touted the facility located in Morris, Illinois as "highly prized and acclaimed."

118. In order to procure plaintiffs' investment Feiner promised that the facility was "profitable and had a lot more upside potential," and stated that the facility would be a "long-term hold" that would complement the plaintiffs' other holdings. Plaintiffs relied on their fiduciary Feiner's representations.

119. Feiner further falsely represented that Feiner and the current operator of the facility would both invest $500,000.00 in the new deal to acquire the facility.

120.    Feiner deceived the plaintiffs with the intent to inflate the price of the facility so that he could acquire a larger equity stake.

121.    Plaintiffs would discover in 2017 that Feiner's scheme was successful since neither Feiner nor the operator had invested the $500,000.00 as Feiner had represented.

122.    The fraudulent misrepresentation by Feiner falsely inflated the price of the facility so that Feiner could profit by fraudulently causing plaintiffs to invest 100% of the equity in return for a much smaller membership interest and thus securing a larger portion of the membership interest for himself than he would have otherwise have had.

123.    Feiner's April 23, 2013 email caused the plaintiffs to invest $3,200,000.00 in the Morris facility.

124.    Per Feiner's modus operandi, FNR Morris, LLC was created to hold the Morris facility and an operating agreement was executed on July 10, 2013 naming Feiner as sole manager of FNR Morris, LLC. The operating agreement between Godin, Shulman and Feiner expressly set out that the manager held a fiduciary relationship to Godin and Shulman. The operating agreement set the plaintiffs' membership interests at 57.13% in return for their $3,200,000.00 investment.   The operating agreement is attached hereto as exhibit E.

125.    Upon information and belief, Feiner caused the plaintiffs to transfer by wire $3,200,000.00 to FNR Healthcare's bank account in order to aggregate the funds necessary to purchase the Morris facility and carry out Feiner's scheme.

28

126.    Upon information and belief, Feiner caused the transfer by wire of $3,200,000.00 from FNR Healthcare's bank account to a third party seller in order to acquire the Morris facility.

127.    After the acquisition of the Morris facility, Feiner made quarterly distributions to plaintiffs until 2016 when Feiner failed to make distributions for the first two quarters.

128.    The plaintiffs pressed Feiner for an explanation as to why there had been no distributions; Feiner misled the plaintiffs with the intent to defraud them by falsely stating that United States Department of Housing and Urban Development (HUD) had implemented new regulations restricting distributions to a semi-annual basis on any new facility financed through HUD.

129.    Feiner, with the intent to defraud, falsely represented to plaintiffs that everything would be back on track if they completed the new HUD mandated paperwork for the semi-annual basis for distributions.

130.    In his quest to further his scheme, Feiner deceived plaintiffs by causing them to transfer via mail certain documents which Feiner had misrepresented as required paperwork by HUD in order to receive their quarterly distributions.  In actuality Feiner was stalling for time since he had converted the distributions that were due to plaintiffs.

131.    In another attempt to stall discovery of his scheme, Feiner paid plaintiffs the distribution they were due for the second quarter of 2016.  That was the last distribution plaintiffs received and as of the present they have not received

any further distributions due to them under the FNR Morris, LLC operating agreement.

132. Throughout the entire acquisition of Morris, Baver acted in concert with Feiner to further advance the scheme by managing the finances, wire transfers, records, negotiations, and distributions in connection with Morris.

133. As vice president of FNR Healthcare, Baver had intimate personal knowledge of FNR Morris, LLC's accounts and financial status. Baver withheld and misrepresented information sought by plaintiffs at every step until plaintiffs discovered the scheme and confronted him.

134. As a direct and proximate result of defendants' actions, plaintiffs sustained damages of a pecuniary nature in an amount not less than $3,200,000.00.

### FNR Norridge, LLC Scheme

135. FNR Norridge, LLC (Norridge) was another scheme perpetrated by Feiner and Baver to defraud plaintiffs. Norridge was established to hold a retirement healthcare facility that was located in Norridge, Illinois. The operating agreement between Godin, Shulman and Feiner expressly set out that the manager – Feiner - held a fiduciary relationship to Godin and Shulman.

136. In line with the other schemes, Norridge arose from regular and repeated correspondence and telephonic communications between the parties.

137. Plaintiffs invested $5,600,000.00 in order to acquire the Norridge facility. As part of the deal, Feiner falsely represented that the operator had an

option to buy the facility for substantially higher than the amount invested by plaintiffs.

138.    Feiner's statement was false and the operator actually possessed an option to buy the facility for $5,100,000.00, $500,000.00 less than the plaintiffs had invested.

139.    The operator currently possesses the option to acquire the Norridge facility for $5,100,000.00.  The option is active as long as the thirty year (30) lease is active.

140.    Feiner also intentionally concealed that he owned approximately 45% of the operator through his entity Netzach Investments, LLC (Netzach) and Baver owned 5% directly and Baver's brother, Barak Baver, owned 25%.

141.    Feiner is the sole manager of Netzach and, upon information and belief, Netzach members include Feiner's children and family.

142.    The blatant self-dealing perpetrated by Feiner was intentionally concealed from plaintiffs because it was in direct violation of the fiduciary duties owed by Feiner to plaintiffs pursuant to the Norridge operating agreement.

143.    The intentional concealment induced plaintiffs to invest in Norridge and grant the operator an option without knowledge that Feiner had majority ownership of the operator through Netzach.  Plaintiffs would not have agreed to invest had they known that Feiner possessed an ownership in the operator.

144.    Norridge was scheme where Feiner used plaintiffs' investments and misused their trust to profit from his fiduciary position as manager in a blatant self-dealing arrangement.

145.    As a result of defendants' actions, plaintiffs sustained damages of a pecuniary nature in an amount of at least $5,600,000.00.

<u>Lieberman Scheme</u>

146.    In each transaction outlined above, Feiner received a membership interest in the limited liability companies that were created to hold each retirement healthcare facility.

147.    The membership interest Feiner received in each LLC varied from 30% to 45%. The membership interest was given to Feiner in return for either the sweat equity he was to contribute in lieu of a monetary investment or due to his own investment.

148.    Feiner was to implement his specialized skills to increase the value of the facilities and he would share in the proceeds of the sales at a set percentage after the plaintiffs had recovered their initial investments.

149.    Feiner's membership interests also entitled him to distribution payments but only after plaintiffs received a preferred return as described in each individual operating agreement between the parties.

150.    The membership interests Feiner sold did not entitle him to the distributions and equity as he represented to Lieberman.

151.   On information and belief, soon after acquiring a membership interest in the foregoing LLCs plaintiffs' invested in and owned, Feiner sought out investors to whom he would purportedly sell parts of his membership interest.

152.   Henry Lieberman, a New York resident, was solicited by Feiner to invest in Lakeview and Vermillion.

153.   Feiner represented to Lieberman that he owned certain membership interest in Lakeview, SH Healthcare, Vermillion, FNR Worthington, Pepper Pike, FNR Mountiancrest, FNR NVP, FNR Farmington, and FNR Champaign.

154.   Feiner mislead Leiberman to believe that Feiner's membership interests were backed by capital equity when in reality the plaintiffs had contributed 100% of the capital equity and only their membership interests were fully guaranteed to be recouped.

155.   Feiner represented that Lieberman would receive a 12% return on his investment in Lakeview and SH Healthcare, and a 10% investment on Vermillion.

156.   Feiner caused Lieberman to wire transfer $450,000.00 to FNR Healthcare's bank accounts in return for membership interests in Lakeview and Vermillion.

157.   To date, Lieberman has not received distributions in the amount represented by Feiner.

158.   Presently, Lieberman can no longer receive distributions from either Lakeview or Vermillion since the facilities have been sold and SH Healthcare cannot provide any distributions because it is operating at a deficit.

159. However, Feiner has recently sent out purported distribution to Lieberman representing distributions from property that had already been sold. Feiner did this to intentionally keep Lieberman in the dark so that he would not discover his scheme and alert the authorities and to induce further investments by Lieberman.

160. Feiner knowingly provided false representations that Lieberman's investment in Lakeview and SH Healthcare would receive 12% return.

161. Feiner knowingly provided false representations that Lieberman's investment in Vermillion would receive 10% return.

162. Feiner made the above misrepresentations, among others, knowing they were false and/or with reckless disregard for their falsity.

163. Feiner made the above misrepresentations among others, with the intent to deceive Lieberman.

164. Feiner's representations were made willfully and wantonly.

165. Lieberman reasonably relied upon the misrepresentations of Feiner in investing in Lakeview and Vermillion.

166. Feiner employed the same tactics outlined above to induce Lieberman to purchase non-existent membership shares in following LLCs at the amounts listed;

| | | |
|---|---|---|
| A. | FNR Worthington | $100,000.00 |
| B. | Pepper Pike | $ 25,000.00 |
| C. | FNR Mountaincrest | $100,000.00 |

| | | |
|---|---|---|
| D. | FNR NVP | $200,000.00 |
| E. | FNR Farmington | $100,000.00 |
| F. | FNR Champaign | $100,000.00 |

167.    As a direct result of Feiner's misrepresentations Lieberman was induced to invest approximately $1,500,000.00.

Starck Scheme

168.    Israel Starck, a 90 year old holocaust survivor, was another victim of Feiner's schemes.

169.    As with Lieberman, Feiner solicited Starck via U.S. Mail and telephone with opportunities to invest in Lakeview, Vermillion, FNR Champaign, FNR Worthington, and others.

170.    On information and belief, Feiner made similar misrepresentations Starck as he had to Lieberman.

171.    On information and belief, Feiner caused Starck to wire transfer funds to FNR Healthcare's bank accounts in return for membership interests in Lakeview, Vermillion, FNR Champaign, and FNR Worthington.

172.    The membership interests Feiner sold did not entitle him to the distributions and equity as he represented.

173.    To date, Starck has not received distributions in the amount represented by Feiner.

174.    Presently, Starck can no longer receive distributions since the facilities have been sold.

175.   Feiner knowingly provided false representations that Starck's investment in Lakeview would receive 12% return.

176.   Feiner knowingly provided false representations that Starck's investment in Vermillion would receive 10% return.

177.   Feiner made the above misrepresentations, among others, knowing they were false and/or with reckless disregard for their falsity.

178.   Feiner made the above misrepresentations among others, with the intent to deceive Starck.

179.   Feiner's representations were made willfully and wantonly.

180.   Starck reasonably relied upon the misrepresentations of Feiner in investing in Lakeview, Vermillion, FNR Champaign, and FNR Worthington.

181.   As a direct result of Feiner's misrepresentations Starck was induced to invest approximately $2,500,000.00.

<u>Metropolitan Capital Bank Scheme</u>

182.   On or about September 4, 2014 Feiner entered into a loan agreement with Metropolitan Capital Bank (Met Cap) for an amount of $4,500,000.00 (Loan). The proceeds were used to repay a loan taken out by the Bravo Holding Company, Inc. (Bravo) from a different lender.

183.   Concurrently with the execution of the loan agreement, additional documents were executed and delivered to Met Cap as security for the loan agreement and the promissory note, including a guaranty of payment executed by Feiner.

184.    Beginning in September 30, 2015 and through March 31, 2017, Feiner, Bravo and Met Cap entered into five loan modification agreements due to Feiner and Bravo being in default of the loan.

185.    The fifth loan modification agreement was entered into on March 31, 2017 and provided that a revised promissory note was signed and delivered by Feiner and Bravo to Met Cap for $3,232,294,68. Feiner became a borrower in addition to a guarantor.

186.    In order to induce Met Cap to enter the fifth modification, Feiner agreed to pledge to Met Cap all of his right, title, and interest in and to all his distribution rights, if any, and any distributions actually received by him in Norridge as additional collateral and security for the revised note.

187.    On or about March 31, 2017, Feiner executed the security agreement regarding his pledge of Norridge as security for the revised note.

188.    In the security agreement, Feiner falsely warranted that no prior assignment or pledge of Norridge existed and that no prior financing statements covering Norridge was on file in any public office.

189.    Unbeknownst to Met Cap, Feiner had already pledged Norridge to Dmitry Godin and Ilya Shulman on February 19, 2017 thus making his March 31, 2017 representations false.

190.    Unbeknownst to Met Cap and plaintiffs, Feiner had previously pledged Norridge to SLG Limited Partnership on or about May 23, 2014 thus making his

representations to plaintiffs on February 19, 2017 and his representations to Met Cap on March 31, 2017 false.

191. Feiner knowingly provided false warranty that Norridge was not previously pledged.

192. Feiner made the above misrepresentations among others, with the intent to deceive Met Cap and plaintiffs.

193. As a direct result of Feiner's misrepresentations to Met Cap, Feiner obtained $3,353,838.29 for his personal use.

<u>Discovery of Schemes</u>

194. As detailed *supra*, plaintiffs were unaware of the schemes Feiner and Baver devised, conducted, participated and/or assisted in to defraud the plaintiffs until February 2017.

195. At the beginning of 2017, the plaintiffs became suspicious of defendants' delay in paying out distributions in the above LLCs and the many excuses that they advanced to explain the delays.

196. The plaintiffs were not aware that Feiner and Baver were delaying distributions to cover up the fact that they had either sold off the underlying facilities in the LLCs or otherwise had covered up that they had converted the distributions for their own use.

197. At the beginning of 2017, plaintiffs engaged the services of legal counsel to explore the state of FNR South Holland, LLC. Plaintiffs learned that Feiner had sold the South Holland nursing home facility on September 30, 2015.

198.   This was the first time plaintiffs learned that the South Holland facility had been sold by Feiner.

199.   Shocked and outraged at the discovery of the fraud committed by Feiner, Shulman reached out to a rabbi within the Orthodox Jewish community to alert him what Feiner had done.

200.   On information and belief, the rabbi then contacted Feiner and confronted him with Shulman's accusations to which Feiner confessed to selling the South Holland facility.

201.   On February 17, 2017, Feiner contacted Shulman via telephone and admitted to selling the South Holland and Lakeview facilities on approximately September 30, 2015.  Feiner admitted that he had sold off the facilities to pay other liabilities and for his personal use.

202.   On February 19, 2017, Shulman confronted Feiner in person and during the ensuing conversation Feiner further admitted that he had also sold the Vermillion facility on approximately September 30, 2015 and had taken approximately $1,000,000.00 from the cash-out refinance of the Woodview facility sometime in mid-2015.  Again, Feiner admitted that he had used the money from disposal Vermillion and the cash-out refinance of Woodview to pay other liabilities that he had.

203.   In 2017 Shulman called Baver via telephone about the various facilities that had been disposed of already.  Baver told Shulman that everything was as it should be and there was nothing amiss.

204.   As vice president of FNR Healthcare, Baver had intimate personal knowledge of accounts, documents, records, and financial status of the facilities Feiner managed through FNR Healthcare and on behalf of plaintiffs. The representations Baver made to Shulman regarding the various LLCs were false.

205.   Furthermore, Baver had the incentive to lie to plaintiffs because he had been a direct beneficiary of the disposition of some of the facilities since he had received commission from their sale.

206.   Later Shulman went to Baver's residence and confronted him about the sale of various facilities.  Baver then first admitted that he knew about the sales of the facilities and stated that he was "in a difficult situation." Baver also admitted that he received proceeds from the sales of all of the facilities except Vermillion facility since it was sold to his brother Barak Baver.  Baver also admitted that he had been given an interest in Morris by Feiner .

207.   Only after Feiner's and Baver's admissions when confronted in 2017, did the plaintiffs learn of the deception, theft, misrepresentation and frauds defendants had engaged in for more than eighteen (18) months and possibly as long as five years.

<u>Summary</u>

208.   Feiner and Baver directly and indirectly conducted and participated in conducting the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

209.    The predicate acts making up the scheme began as early as 2012 and, based on information and belief, are ongoing.

210.    The pattern of predicate acts engaged in or participated in by Feiner and Baver, as set forth above, constituted knowing use of the mails and wires with specific intent to deceive and defraud, in violation of the federal mail fraud statute, 18 U.S.C. § 1341 and the federal wire fraud statute, 18 U.S.C § 1343.

211.    The above acts were done in furtherance and for the purpose of executing a unified scheme to defraud investors and plaintiffs and were related to one another as it involved common participants, common targets, and common purposes and results.

212.    Feiner and Baver invested the proceeds of their conduct in the FNR Healthcare, LLC that form the above-described enterprise affecting interstate commerce, in violation of 18 U.S.C. § 1962(a).

213.    Feiner and Baver also obtained funds directly through acts of racketeering described above, in violation of 18 U.S.C. § 1962(c).

214.    As a result of defendants' mail and wire fraud, plaintiffs have been damaged in their business and property in an amount greater than $20,000,000.00.

215.    Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to recover threefold their damages plus costs and attorney's fees.

## First Claim for Relief

### (Violation of 18 U.S.C. § 1962(c))

216.    The plaintiffs here repeat the allegation of paragraphs 1-215 of the Complaint. 211.    Ilya Shulman and Dmitry Godin are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

217.    The defendants Zvi Feiner and Erez Baver are "persons" within the meaning of 18 U.S.C. § 1961(3).

218.    FNR Healthcare is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce during the relevant times.

219.    The defendant Feiner was employed by or associated with an enterprise, that is, FNR Healthcare, and did conduct or participate, directly or indirectly, in the conduct of the affairs of FNR Healthcare through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B) and 1961(5) and 1962(c), to wit:

      (a)  Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

      (b)  Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

220. The defendant Baver was employed by or associated with an enterprise, that is, FNR Healthcare, and did conduct or participate, directly or indirectly, in the conduct of the affairs of FNR Healthcare through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B) and 1961(5) and 1962(c), to wit:

(a)  Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

(b)  Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

221.  By reason of the violation of 18 U.S.C. § 1962(c) committed by defendants Feiner and Baver, plaintiffs Shulman and Godin were injured in an as yet undetermined amount, believed to be not less than approximately Twenty Million Dollars ($20,000,000.00), within the meaning of 18 U.S.C. § 1964(c).

<u>Second Claim for Relief</u>

(Violation of 18 U.S.C. § 1962(d) by Conspiracy to Violate 18 U.S.C. § 1962(c))

222.  The plaintiffs here repeat the allegation of paragraphs 1 - 215 of the Complaint.

223.  Ilya Shulman and Dmitry Godin are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

224.  The defendants Zvi Feiner and Erez Baver are "persons" within the meaning of 18 U.S.C. § 1961(3).

225.  FNR Healthcare is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce during the relevant times.

226.  The defendant Feiner was employed by or associated with an enterprise, that is, FNR Healthcare, and did conduct or participate, directly or indirectly, in the conduct of the affairs of FNR Healthcare through a pattern of

racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B) and 1961(5) and 1962(c), to wit:

      (a)  Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

      (b)  Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

227. The defendant Baver was employed by or associated with an enterprise, that is, FNR Healthcare, and did conduct or participate, directly or indirectly, in the conduct of the affairs of FNR Healthcare through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B) and 1961(5) and 1962(c), to wit:

      (a)  Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

      (b)  Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

228. By reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants, Shulman and Godin. were injured in an as yet undetermined amount, believed to be not less than approximately Twenty Million Dollars ($20,000,000.00), within the meaning of 18 U.S.C. § 1964(c).

<u>Third Claim for Relief</u>

(Common Law Fraud)

229. The plaintiffs here repeat the allegations of paragraphs 1 - 215 of the Complaint.

230. Feiner and Baver made their false and untrue material misrepresentations for the purpose of inducing Shulman and Godin to rely upon them, the plaintiffs did rely upon them, the plaintiffs reasonably relied on them and the plaintiffs were harmed and damaged as a result of that reliance. Defendants made the false and untrue statements in the course of their employment and with the consent and approval of FNR Healthcare

231. By reason of the fraud committed by Feiner, Baver and FNR Healthcare, Shulman and Godin were injured in an as yet undetermined amount, believed to be not less than approximately Twenty Million Dollars ($20,000,000.00).

### Fourth Claim for Relief

### (Constructive Trust)

232. The plaintiffs here repeat the allegations of paragraphs 1 - 215 of the Complaint.

233. Feiner, Baver and FNR Healthcare have appropriated the assets, income and resources of the plaintiffs while they were in a fiduciary capacity and they engaged in common law fraud, conversion and theft to divert and obtain control over plaintiffs' money.

234. The court should impose, once the extent of Feiner's, Baver's and FNR Healthcare's financial gains are determined, a constructive trust upon the property of the defendants that they have accumulated by virtue of their breaches of fiduciary duty, fraud, theft and diversion.

Fifth Claim for Relief

(Equitable Accounting)

235.    The plaintiffs here repeat the allegations of paragraphs 1 - 215 of the Complaint.

236.    Feiner and Baver have appropriated the assets, money and resources of the plaintiffs while they were in a fiduciary capacity and they engaged in common law fraud to divert and obtain control over plaintiff's money. They used the enterprise FNR Healthcare to perpetuate their schemes and enrich themselves at plaintiffs' expense.

237.    The court should order Feiner, Baver and FNR Healthcare to render full and complete accounts and accountings to plaintiffs for the money they received from the plaintiffs since their initial investment to date for the various entities alleged above and that was funneled and aggregated through FNR Healthcare.

Sixth Claim for Relief

(Conspiracy)

238.    The plaintiffs here repeat the allegations of paragraphs 1 - 215 of the Complaint.

239.    Feiner and Baver conspired to and agreed upon a scheme to enrich themselves, at the expense of the plaintiffs, using a vehicle that appeared to be legitimate for the acquisition and disposition of retirement healthcare facilities.

240.    Feiner and Baver conspired and agreed to each play a role as aforesaid and participate in unlawful acts of fraud, deception, diversion, theft, bank fraud.

46

241.   The plaintiffs were harmed, injured and damaged by said defendants' unlawful overt acts of fraud and deception and by their agreement and conspiracy to so act.

242.   The defendants' aforesaid acts of fraud and deception were done pursuant to and in furtherance of the common scheme of the defendants to enrich themselves at the plaintiffs' expense.

<u>Seventh Claim for Relief</u>

(Breach of Fiduciary Duty)

243.   The plaintiffs here repeat the allegations of paragraphs 1 - 215 of the Complaint.

244.   The defendants, and each of them, by virtue of the operating agreements, the promises and representations they made, the manner in which they operated and managed the affairs of the aforesaid LLCs, the information they communicated to plaintiffs and their roles and their employment they were in a fiduciary capacity with the plaintiffs starting in January of 2012 and continuing to this date and owed the plaintiffs and each of them a fiduciary duty of honesty, loyalty and placing the plaintiffs' interests before their own.

245.   Despite their duty aforesaid and violation of the positions of trust they occupied relative to the plaintiffs they engaged in the egregious acts of misconduct, theft, diversion, deception, fraud, errors and omissions as alleged.

246. As a direct and proximate result of the foregoing violations of their duty to the plaintiffs defendants obtained plaintiffs' money by theft and deception and caused plaintiffs injuries of a pecuniary nature.

<u>Prayer for Relief</u>

Wherefore the plaintiffs Ilya Shulman and Dmitry Godin pray:

That judgment be entered for them and against Zvi Feiner and Erez Baver and each of them jointly and severally:

A.    In a yet to be determined amount not less than n Twenty Million Dollars ($20,000,000.00) upon the First Claim for Relief, for violation of 18 U.S.C. § 1962(c), the sum duly trebled in accordance with 18 U.S.C. § 1964(c) plus costs and attorneys' fees.

B.    In a yet to be determined amount not less than Twenty Million Dollars ($20,000,000.00) upon the Second Claim for Relief, for violation of 18 U.S.C. § 1962(d) by conspiracy to violate 18 U.S.C. § 1962(c), the sum duly trebled in accordance with 18 U.S.C. § 1964(c) plus costs and attorneys' fees.

That judgment be entered for them and against Feiner, Baver and FNR Healthcare and each of them jointly and severally:

C.    In a yet to be determined amount not less than Twenty Million Dollars ($20,000,000.00) upon the Third and Fourth Claims for Relief plus costs.

48

> D.   To account for financial activities of the defendants and the LLCs owned by the plaintiffs from January of 2012 to date upon the Fifth Claim for Relief plus costs.

That judgment be entered for them and against Feiner and Baver and each of them jointly and severally:

> E.   In a yet to be determined amount not less than Twenty Million Dollars ($20,000,000.00) upon the Sixth and Seventh Claims for Relief plus costs.

The plaintiffs demand trial by jury on all claims.

September 19, 2017                    Ilya Shulman and Dmitry Godin, plaintiffs


                                      By:  /s/ Craig D. Tobin
                                           Craig D. Tobin, their attorney


Craig D. Tobin
Tomas Petkus
Genc Arifi
Tobin & Muñoz, L.L.C.
Attorneys for Plaintiffs
Three First National Plaza, #1950
Chicago, IL 60602-4298
Office (312) 641-1321
Facsimile (312) 641-5220
Email ctobin@barristers.com
        tomaspetkus@barristers.com
        garifi@barristers.com

\\M1\Clients\T&M\FNR Lakeview\Pleadings\Complaint.f.docx